IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KENNETH MARLOW,

          Plaintiff,

    v.

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

        Defendant.

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 05-1175

**OPINION**

APPEARANCES:

Alan H. Polonsky, Esquire
512 South White Horse Pike
Audubon, NJ 08106
    Attorney for Plaintiff

Christopher J. Christie
United States Attorney
    By:  Margaret A. Donaghy
        Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
    Attorney for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration, denying the application of the

plaintiff, Kenneth Marlow, for Disability Insurance Benefits

under Title II of the Social Security Act and Supplemental

Security Income under Title XVI of the Social Security Act.  42
U.S.C. § 401, et seq.  This Court must determine 1) whether the
Administrative Law Judge properly determined that Plaintiff's
psychological impairment was not "severe" and 2) whether the ALJ
properly determined Plaintiff's residual functional capacity.
For the reasons stated below, this Court will affirm the decision
of the Commissioner denying Plaintiff's application for
Disability Insurance Benefits and Supplemental Security Income.

**I. Background**

    A.   <u>Procedural History</u>

    On May 8, 2002, Plaintiff, Kenneth Marlow, filed
applications for a period of disability, Disability Insurance
Benefits ("DIB") and Supplemental Security Income ("SSI")
alleging disability, commencing on January 30, 2002, due to a
seizure disorder and an anxiety disorder.  These applications
were denied on initial consideration (Tr. at 26-31, 263-268) and
on reconsideration.  (Tr. at 34-37, 270-273.)  A hearing was
requested and held before an Administrative Law Judge ("ALJ") on
July 8, 2004.

    ALJ Mark Barrett issued a decision denying benefits on
October 25, 2004.  Judge Barrett held that Plaintiff's anxiety
disorder was not a "severe" impairment.  Additionally, the ALJ
held that Plaintiff's seizure disorder, however severe, did not

meet the requirements for the Listing of Impairments, and that
such an impairment would not prevent from returning to his past
work as a casino cashier.  (Tr. at 22.)

Plaintiff filed a request for review of the ALJ's decision
to the Appeals Council on November 15, 2004.  The request for
further review was denied on January 23, 2005.  Plaintiff then
filed the present action with this Court on March 1, 2005.

B. Evidence in the Record

1. Plaintiff's Testimony

Plaintiff testified that he lived at 506 Main Street,
Cedarville, New Jersey and that he was born on October 6, 1975.
(R. at 281.)  Plaintiff has not received his GED, but has
obtained a casino-cashier's license. (R. at 285-86.)  Plaintiff's
height is between six foot one and six foot two and he weighed
roughly 203 pounds at the time of the hearing. (R. at 298.)
Plaintiff testified that he weighed roughly 242 pounds before he
started having epileptic fits.  (R. at 298.)

Plaintiff resides with two out his five biological children,
his girlfriend and her two children.  (R. at 282-85.)  At the
time of his hearing, Plaintiff was most recently employed as a
custodian for the Fairfield Board of Education, where he was let
go for leaving work early. (R. at 288-89).  He claims that his
supervisor originally told him he could leave early if all his
work was done, but still get paid for a full eight hours.  (Id.)

Plaintiff said that his health problems began on January 30, 2002, when his girlfriend, Angela Eldrich, woke him from his sleep and told him that he had a seizure.  (R. at 290.) Plaintiff claimed that his anxiety disorder developed around the same time.  (Id.)  According to his testimony, Plaintiff regularly experiences anxiety, manifesting itself as "feeling nervous" even as he was talking to the Administrative Law Judge. (R. at 291.)

Plaintiff testified that he experiences seizures every three to six months, the last one being March 17, 2004. (Id.)  He described the seizure as "falling out of it" and losing sense of where he is until someone really tried to sit him up and wipe the sweat from him.  (Id.)  Plaintiff testified that despite his regular feelings of "nervousness," he only has anxiety attacks when on the road, traveling far distances where there is a lot of traffic.  (R. at 292.)

Although he has not had significant employment since his job with the Board of Education, Plaintiff was compensated by his girlfriend's employer for babysitting her children.  (R. at 294.) His current source of income is $832 a month in treasury checks for his daughters from their mother's pension.  (R. at 294.) Plaintiff was receiving unemployment benefits, but these benefits ran out after the 6 month allotment.  (Id.)

Plaintiff described his employment in the casino industry

4

beginning with the Atlantic City Showboat, where he was an impressment team member.  (R. at 299.)  For that job, he would unload money from the change booths and fill them up again for the following shift.  (Id.)  Plaintiff was on his feet for this work, carrying approximately 30 pound bags of coins.  (R. at 300.)  Plaintiff also worked at Bally's, where he would empty the drawer at the bottom of the slot machines to empty the coin buckets.  These buckets would sometimes weigh as much as 40 or 50 pounds. (R. at 301.)  Also, Plaintiff was a cashier at the Claridge Casino.  (R. at 302.)  All of his various casino employment required him to stand unless given a break.  (Id.)

Plaintiff explained that his arms are affected by the strain of the seizures.  (R. at 303.)  He complained of soreness in his right shoulder and legs as a result of the seizures.  At the time of the hearing, his shoulder and legs were still in pain.  (R. at 305.)  Plaintiff has been prescribed Dilantin for his seizures and Aleve when he gets headaches. (Id.)  Plaintiff also said he had been attending a guidance center about his anxiety and was seen by a Dr. Mago, but stopped when he could no longer afford it.  (R. at 308.)

Plaintiff testified that he is capable of doing light housework like vacuuming and washing dishes.  (R. at 310.)  He does these chores at a soft pace because of the pain in his shoulder.  (Id.)  Plaintiff does not drive and his girlfriend

5

takes him to appointments with his physician, Dr. Kohler.  (R. at 311.)  Plaintiff testified that he does not have health insurance, and that his girlfriend and girlfriend's mother lend him the money for these doctor visits.  (R. at 314.)

Under examination by his attorney, Plaintiff then testified that Dr. Kohler prescribed his medications and that he would visit him roughly once every six months.  (R. at 316.)  Upon the recommendation from someone at Dr. Kohler's office, a Dr. Ordilly to the best of Plaintiff's recollection, Plaintiff also visited a neurologist once named Dr. Rampal. (R. at 316-17.)  However, Plaintiff found Dr. Rampal's attitude to be very "edgy" and did not see him again. (R. at 316.)

Plaintiff answered questions from his attorney regarding his use of Dilantin and his seizure disorder.  (R. at 319.)  Plaintiff testified that he has used Dilantin for three years and his dosage has increased over that time. (Id.)  In March of 2003, Plaintiff was hospitalized for three days for his seizure disorder.  He had a brief hospital visit in May of 2003 and again the following December. (R. at 321.)  In March of 2004, Plaintiff went to the hospital for a seizure, but he was not admitted.  Plaintiff testified that the doctors "built [his] Dilantin level back up" and told him to visit his family doctor as soon as possible. (R. at 322.)  Plaintiff described the after effects of his seizures as causing him pain in the legs and arms.  (Id.)

Plaintiff said that his girlfriend attributed his weight loss to the medication, although a doctor never confirmed that. (Id.)

Plaintiff discussed seeing Dr. Mago, a psychiatrist, at the Cumberland County Guidance Center. (R. at 317.)  Plaintiff was going to the guidance center from October of 2002 to April of 2003.  Dr. Mago prescribed the patient something for his anxiety, but Plaintiff was unable to recall the name of the drug, other than that it began with the letter "P." (R. at 325.)  These prescriptions would be enough for 30 days.  (R. at. 324.) Plaintiff stopped attending the center when he could no longer afford it.  (R. at 325.)

Plaintiff claimed he experiences anxiety attacks once or twice a week, lasting 15 to 20 minutes. (R. at 327.)  Plaintiff likes to be alone during these attacks, and they cause him relationship troubles with his girlfriend.  (Id.)  Plaintiff said that when these attacks occur he would rather sit down than do work.  (Id.)

Plaintiff testified that the last time he worked was the end of 2001, and that he liked working when he was able.  (R. at 330.)  He said that if he could work, he would go back to the casinos because there's a lot of overtime.  (Id.)  However, Plaintiff said that Dr. Kohler has not yet cleared him to go back to work.  (Id.)

7

2. <u>Angela Eldrich's Testimony</u>

<u>      </u>Angela Eldrich testified that she has been with the
Plaintiff for nearly four years. (R. at 332.)  During that time,
she has been in Plaintiff's presence when a seizure developed.
(<u>Id</u>.)  She described the seizures as occurring in his sleep and
lasting one to two minutes.  (R. at 333.)  According to her
testimony, Plaintiff urinates on himself and is not coherent for
an hour or two later.  (<u>Id</u>.)   To the best of her recollection,
Plaintiff has been taken to the hospital five or six times for
seizures.  (<u>Id</u>.)

    Ms. Eldrich testified that she has been in Plaintiff's
presence during his anxiety attacks and what Dr. Mago referred to
as "brain freezes."  During these "brain freezes," Plaintiff will
smile, lick his lips and his eyes will tear up, but he is unable
to answer questions or respond to someone. (R. at 334.)  She said
this has happened as often as twice in a month, although it has
not happened lately. (<u>Id</u>.)

    The anxiety attacks tend to occur when Plaintiff is around
crowds of people.  (R. at 335.)  Plaintiff also experiences bad
mood swings that, according to Ms. Eldrich, make him difficult to
live with.  (R. at 336.)  She believes Plaintiff was easier to
live with when he was attending the guidance center, particularly
because he had an easier time sleeping through the night. (<u>Id</u>.)

    Ms. Eldrich said that she buys Plaintiff's Dilantin at a

8

cost of $56.99 a month. (R. at 338.) This is paid out of Ms.
Eldrich's welfare payments and the support payments for
Plaintiff's children, a total household income of roughly $1600.
(R. at 339.)  Ms. Eldrich also discussed the time period when
Tri-County Child Care would pay Plaintiff for watching her
children.  (R. at 341.) She believes the babysitting income was
around $496 a month.  (R. at 342.)   The ALJ asked Ms. Eldrich to
find any pay stubs or other paperwork that would indicate the
exact amount.


####       3. Medical Reports

       Plaintiff was treated for a seizure at South Jersey Hospital
on April 9, 2002. (R. at 155-62.)  Dr. Frank F. Kohler's
treatment notes indicate that he first saw Plaintiff on May 3,
2002.  (R. at 257.)  On May 23, 2002, Dr. Kohler completed a
medical reported indicating that Plaintiff suffered from
idiopathic epilepsy and that, though ambulatory, Plaintiff could
now work.  (R. at 163.)  In an undated treatment note, Dr. Rampal
wrote that Plaintiff had experienced seizures and that the
seizures could be a result of non-compliance with medication.
(R. at 165.)  Dr. Rampal also noted that the examination revealed
a normal remote memory, abstract reasoning ability, and gait.
Furthermore, Plaintiff's muscle tone, power and mass were all
normal.  (Id.)

Dr. Kohler reported that Plaintiff was unable to work from October 25, 2002 through October 31, 2003.  (R. at 167-68.)  However, Dr. Naphtali Britman, a state agency physician, reviewed the record and opined on February 5, 2003 that Plaintiff had no exertional impairments.  (R. at 171.)  He did write that Plaintiff should never climb ladders, ropes or scaffolds.  (R. at 172.)  Also, Dr. Britman indicated that Plaintiff should avoid all exposures to hazards, including machinery and heights.  (R. at 174.)  On March 2, 2003, Plaintiff was seen at the emergency room of South Jersey Hospital complaining of another seizure (R. at 180.)

Plaintiff visited the Cumberland County Guidance Center from October 21, 2002 through July 9, 2003.  (R. at 187-99, 236.)  On October 21, 2002, Dr. Mago diagnosed an anxiety disorder at axis I and epilepsy at axes III and IV. (R. at 191.)  Plaintiff's global assessment of functioning was 65 at axis V. (Id.)  On December 19, 2002 the Guidance Center report shows that Plaintiff said he was feeling better.  By January 8, 2003, Plaintiff reported that he was doing better and that his medications were excellent.  (R. at 189.)

On March 14, 2003 and May 29, 2003, state agency physicians reviewed the record and opined that Plaintiff's mental functioning was not significantly limited, except his abilities to maintain attention and concentration for an extended period,

complete a normal workweek interact appropriately with the public and travel to unfamiliar places were moderately limited. (R. at 214-15.) In May of 2003, Dr. Kohler reported that Plaintiff was having seizures despite his compliance with the medication. (R. at 219.) Plaintiff reported another seizure in January of 2004, and he reported that he ran out of his medication. (R. at 224.)

Dr. Adrian Didita examined Plaintiff on June 1, 2004. (R. at 225-228.) Plaintiff reported to Dr. Didita that his last seizure was on March 17, 2004. (R. at 225.) Plaintiff's only regular medications were Dilantin at 500 mg a day. (R. at 225.) Plaintiff told Dr. Didita that his daily activities included cooking, cleaning, laundry and shopping. (R. at 226.) Dr. Didita also observed that Plaintiff's gait and station were normal and that he could walk heel-to-toe without difficulty. (R. at 226.) His grip strength was full and had normal motion range in his cervical, thoracic and lumbar spines. (R. at 226.) There was no tenderness or muscle spasm, straight leg raising was negative bilaterally, and Plaintiff's upper and lower extremities had full strength and normal deep tendon reflexes. (R. at 227.) Dr. Didita's impressions were seizure disorder, depression and anxiety. (R. at 227.) He also opined that Plaintiff has no limitations in lifting, carrying, standing or walking. (R. at 230-31.)

On June 21, 2004, Dr. Kohler reported that Plaintiff's last

11

seizure was on April 6, 2004 and that he needed a refill in his Dilantin.  (R. at 252.)  Then, on August 4, 2004, Plaintiff was examined by a Dr. Crouse, a consultative physician.  Dr. Crouse wrote that upon mental examination, Plaintiff exhibited no unusual behavior.  (R. at 241.)  Dr. Crouse opined that Plaintiff's psychiatric symptom's were mild and "may or may not" last 12 months.  (Id.)  He diagnosed a global assessment of functioning at 70.  (Id.)  Dr. Crouse wrote that Plaintiff's ability to understand, remember, and carry out instructions were not affected by his impairments.  Plaintiff's ability to respond appropriately to supervision, coworkers and work pressures were also not affected.  (R. at 242, 243-44.)

———

## II. Discussion

   A.   Standard of Review

   Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Disability Insurance Benefits.  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial

evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality. See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)). The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him. Id. (citing Van Horn v. Schweiker, 717 F.2d

13

871, 873 (3d Cir. 1983); <u>Cotter v. Harris</u>, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

<u>Gober v. Matthews</u>, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  <u>Williams</u>, 970 F.2d at 1182.  However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See <u>Fargnoli v. Massanari</u>, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards.  <u>Sykes</u>, 228 F.3d at 262; <u>Friedberg v. Schweiker</u>, 721 F.2d 445, 447 (3d Cir. 1983); <u>Curtin v. Harris</u>, 508 F. Supp. 791, 793 (D.N.J. 1981).

B.   <u>Standard for Disability Insurance Benefits</u>

The Social Security Act defines "disability" for purposes of an entitlement to a period of disability and disability insurance benefits as the inability to engage in any substantial gainful

14

activity by reason of any medically determinable physical and/or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §1382c(a)(3)(A). Under this definition, a claimant qualifies as disabled only if his physical or mental impairments are of such severity that he is not only unable to perform his past relevant work, but cannot, given his age, education, and work experience, engage in any other type of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  20 C.F.R. § 404.1520.  This five-step process is summarized as follows:

1.   If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.   If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.   If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.   If the claimant can still perform work he has done in the past ("past relevant work") despite the severe

15

impairment, he will be found "not disabled."

5.     Finally, the Commissioner will consider the claimant's
       ability to perform work ("residual functional
       capacity"), age, education, and past work experience to
       determine whether or not he is capable of performing
       other work which exists in the national economy.  If he
       is incapable, he will be found "disabled."  If he is
       capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is

therefore dependent upon a finding that the claimant is incapable

of performing work in the national economy.

This five-step process involves a shifting burden of proof.

Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150,

1153 (3d Cir. 1983).  In the first four steps of the analysis,

the burden is on the claimant to prove every element of his claim

by a preponderance of the evidence.  Id.  In the final step, the

Commissioner bears the burden of proving that work is available

for the plaintiff: "Once a claimant has proved that he is unable

to perform his former job, the burden shifts to the Commissioner

to prove that there is some other kind of substantial gainful

employment he is able to perform." Kangas v. Bowen, 823 F.2d

775, 777 (3d Cir. 1987).  See Olsen v. Schweiker, 703 F.2d 751,

753 (3d Cir. 1983).

Here, ALJ Barrett determined that Plaintiff has not been

under a disability, as defined in the Social Security Act as

amended, at any time since his alleged onset date of disability,

i.e., January 30, 2002, through the date of the decision.  At

16

step one, the ALJ found that the Plaintiff has not engaged in
substantial gainful activity since the onset of the alleged
disability.  At step two, he found that Plaintiff's anxiety
disorder is not a "severe" impairment, as defined in the Social
Security Act and Regulations.  He did determine that Plaintiff's
seizure disorder is a severe impairment based upon the
requirements of the regulations.  20 CFR § 404.1521; 416.921.
However, the ALJ determined at step three that this impairment
does not meet or equal the criteria of an impairment under 20
C.F.R. Part 404, Subpart P, Appendix 1.  At step four, the ALJ
found that Plaintiff retains the residual functioning capacity to
perform the requirements of his past relevant work as a cashier
in a casino.  Therefore, Plaintiff is not "disabled."

        C.   Plaintiff's Arguments

        Plaintiff's brief lists four arguments against the ALJ's
finding that Plaintiff is not eligible for disability benefits or
supplemental income.  First, Plaintiff argues that the finding of
the ALJ that the Plaintiff does not have a "severe" psychological
impairment is not supported by substantial evidence.  (R. at 11.)
Second, Plaintiff argues that the conclusion of the ALJ that
Plantiff's residual functioning capacity is limited only by
driving and operating machinery is not supported by substantial
evidence or an adequate rationale.  Third, Plaintiff argues that

the ALJ's conclusion that Plaintiff's allegations were not credible was without an adequate rationale.  Finally, Plaintiff argues that the ALJ improperly excluded from consideration the testimony of Plaintiff's witness.

      1.  **Whether substantial evidence supported the ALJ's finding that Plaintiff's mental impairment was not severe**

The ALJ found that Plaintiff's anxiety disorder was not a severe impairment.  Plaintiff argues that the ALJ omitted evidence regarding his psychological functioning, specifically the evaluation of a state agency psychologist, Dr. P. A. Spearman. (R. at 200-17.)  Dr. Spearman indicated in his report that Plaintiff suffered from an anxiety disorder that would create, at most, a moderate degree of limitation.  (R. at 210.) Plaintiff argues that this moderate degree of limitation is sufficient to satisfy the Regulation's definition of a severe impairment, something that is beyond a "slight abnormality." SSR 85-28. Furthermore, it is Plaintiff's contention that the failure to even mention this report precludes affirming the ALJ's decision.

However, Plaintiff was not seeking psychiatric treatment and took no medication for any mental impairments.  It is true that Plaintiff was briefly seen at the Cumberland County Guidance Center ("Guidance Center") from October 21, 2002 through July 9, 2003, but he stopped seeking treatment after eight visits.  (R.

18

at 236.)  Upon his initial visit, Plaintiff's global assessment of functioning was 65.[1]

Indeed, Plaintiff was examined by Dr. Crouse on August 4, 2004, after he stopped treatment at the Guidance Center.  Dr. Crouse diagnosed Plaintiff's global assessment of functioning at 70, which indicates mild symptoms but that Plaintiff was generally functioning well.  Dr. Crouse opined that Plaintiff's ability to understand, remember and carry out instructions were not affected by a mental impairment.  (R. at 242.)  Plaintiff was also not limited in his ability to respond appropriately to supervision, co-workers and work pressures. (Id.)

Despite Plaintiff's argument with regard to the ALJ's lack of consideration toward important evidence, the opinion of the state agency physician Dr. Britman does not drastically alter the analysis in this case.  Dr. Britman's opinion was rendered on May 29, 2003, while Plaintiff was still in treatment at the Guidance Center, and only indicated a moderate degree of mental limitation. Furthermore, Dr. Britman did not personally examine

---

[1] A global assessment of functioning score of 65 corresponds to "some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning, but generally functioning pretty well."  American Psychiatric Ass's, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 1994)(DSM-IV-TR).

According to the Guidance Center's report, Plaintiff's global assessment of functioning had been as high as 80 during that year, which would indicate "no more than slight impairment in social, occupational, or school functioning." Id.

Plaintiff.  Dr. Crouse had the opportunity to examine Plaintiff after he left the Guidance Center, and noted that Plaintiff's memory, insight and judgment were good. (R. at 241.)

It is true that the ALJ did not specifically mention Dr. Spearman's report in his opinion, but an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See Fargnoli, 247 F.3d at 42.  The ALJ wrote that appropriate consideration was given to the assessments of the non-examining state agency physicians.  (R. at 20.)  The ALJ seems to be concentrating on the those physicians who determined that Plaintiff is not disabled, but this is understandable given the weight of the evidence.  Accordingly, despite Dr. Spearman's opinion that there are moderate limitations due to Plaintiff's anxiety, the ALJ properly considered the totality of evidence on record when he determined that Plaintiff's anxiety disorder is not severe.

    2.    **Whether substantial evidence and an adequate rationale support the ALJ's finding that Plaintiff's residual functioning capacity is limited only by driving and operating machinery**

As explained above, the ALJ's determination that Plaintiff has not established a mental impairment that prevented him from doing all work was supported by a substantial evidence. Additionally, the ALJ's determination that Plaintiff's physical

20

impairment (his seizure disorder) only prevents him from driving
and operating machinery is supported by substantial evidence and
an adequate rationale.  The ALJ's determination that Plaintiff is
capable of doing heavy work is supported by the weight of the
evidence.[2]

Dr. Kohler, while treating patient for his epilepsy, opined
on several occasions that Plaintiff was disabled and unable to
work.  Although the diagnosis of a treating physician is
considered as to whether a claimant is "disabled," the ALJ has
the final responsibility to determine claimant's residual
functional capacity to perform past relevant work.  20 C.F.R. §
404.1527(e)(2).  The Third Circuit has long held that "[a] court
considering a claim for disability benefits must give greater
weight to the findings of a treating physician."  Mason v.
Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).  However, the ALJ is
not bound to accept the opinion of a treating physician without
weighing it against the other medical evidence of record.  Kent
v. Schweiker, 710 F.2d 110, 115 n.5 (3d Cir. 1983).  A treating
source opinion is entitled to controlling weight when it is well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other

---

[2] Heavy work requires the ability to lift or carry up to one
hundred pounds with frequent lifting of up to fifty pounds, and
the abilities to stand or walk for up to six hours, and sit for
up to six hours.  20 C.F.R. §§ 404.1567(d) and 416.967(d).

substantial evidence.   20 C.F.R. §§ 404.1527(d)(2) and
416.927(d)(2).

Here, the Court agrees with the ALJ's determination that Dr.
Kohler's opinion should not be afforded controlling weight.
Despite Dr. Kohler's assessment that Plaintiff's seizures were
disabling, Plaintiff reported that he only has seizures once
every three to six months, and that these seizures only happen in
his sleep.  Plaintiff testified that he otherwise felt fine.

Furthermore, Dr. Kohler's opinions are inconsistent with
other substantial evidence in the record.  Dr. Britman, whose
opinion Plaintiff cites for evidence of severe anxiety, opined
that Plaintiff had no exertional impairments.[3]  Dr. Didita also
found that Plaintiff had no limitations in his abilities to lift,
carry, stand or walk.  Dr. Didita did opine that Plaintiff should
avoid driving and operating machinery, and the ALJ properly
considered this when determining Plaintiff's residual functional
capacity.  Considering that Plaintiff was previously employed as
a casino cashier, and that majority of the medical evidence
indicates no exertional impairments, the ALJ properly concluded
that Plaintiff has the functional capacity to return to that line
of work.

---

[3] An exertional impairment is an impairment that affects a
person's ability to meet the strength demands of a job. 20 CFR §§
404.1569a and 416.959a.

    **3.**   **Whether the ALJ had an adequate rationale for**
              **determining that Plaintiff's allegations were not**
              **credible**

    This court declines to substitute its own determination of credibility for that of the ALJ, given that the ALJ had the opportunity to observe the plaintiff first-hand. See Wier v. Heckler, 734 F.2d 955, 962 (3d Cir. 1984) (recognizing that great deference is given to ALJ's determination of credibility). It is within the ALJ's discretion "'to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'" Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Secretary of Health & Human Servs., 504 F. Supp. 288, 291 (E.D.N.Y. 1980)).

    An example of a valid credibility determination is an ALJ's consideration of the fact that a claimant has not sought medical treatment for pain, Mason v. Shalala, 994 F.2d 1058, 1068 (3d Cir. 1992), or that a claimant is not taking medication that was prescribed for pain. Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986).

    Here, in making his residual functioning capacity analysis, the ALJ found that Plaintiff's subjective complaints were generally credible, but not credible to the extent that they precluded him from doing all work. (R. at 20.) The ALJ, noting the guidelines set forth in SSR 96-7p, found that the Claimant's

reported restrictions were not fully persuasive.[4]  The ALJ
believed there to be insufficient medical evidence to "find that
he had functional limitations to such a disabling degree, as to
preclude the performance of all work activity on a sustained
basis for a period of 12 continuous months, at any time through
the date of the decision." (R. at 20.)  Furthermore, the ALJ was
persuaded by evidence in the record that Plaintiff's seizures
were brought on by non-compliance with medication.

Plaintiff argues that the ALJ improperly used Plaintiff's
financial trouble with the medication to discredit Plaintiff's
allegations regarding his ability to work.  It is true that the
Third Circuit held than an inability to afford medication may be
an adequate explanation for a failure to keep up treatment.
Newell v. Commissioner of Social Security, 347 F.3d 541 (3d Cir.
2003).[5]  However, this is not the basis of the ALJ's decision.

---

[4] Purusant to SSR 96-7p, "It is not sufficient for the
adjudicator to make a single, conclusory statement that 'the
individual's allegations have been considered' or that 'the
allegations are (or are not) credible.'  It is also not enough
for the adjudicator simply to recite the factors that are
described in the regulations for evaluating symptoms.  The
determination or decision must contain specific reasons for the
finding on credibility, supported by the evidence in the case
record, and must be sufficiently specific to make clear to the
individual and to any subsequent reviewers the weight the
adjudicator gave to the individual's statements and the reasons
for that weight."

[5] Furthermore, pursuant SSR 82-59, an individual's failure to
follow prescribed treatment will be generally accepted as
"justifiable" and, therefore, such "failure" would not preclude a

Even assuming Plaintiff took his medications as prescribed, with the seizures occurring once every three to six months, the ALJ did not find this physical impairment to result in a total disability, precluding Plaintiff from doing all work.  Indeed, Plaintiff and those in his household are currently living on a combined income of roughly $1,600 a month.  By returning to work, Plaintiff could surely increase his livelihood and afford the cost of medication, an estimated $56.99 a month.  Accordingly, it is this Court's determination that the ALJ properly concluded that Plaintiff's allegations were not credible to the extent that his seizure disorder prevented him from doing all work.

### 4.   Whether the ALJ failed to consider or address the testimony of Plaintiff's witness

Plaintiff argues that the ALJ's opinion fails to address the testimony of Angela Eldrich.  An ALJ must also consider and weigh all of the non-medical evidence before him.  Burnett, 220 F.3d at 122 (citing Van Horn 717 F.2d at 873).  Again, however, an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See Fargnoli 247 F.3d at 42.  The ALJ considered the testimony of Ms. Eldrich, Plaintiff's live-in girlfriend (also referred to as his fiancé) who testified on his behalf.

--------

finding of "disability" or that disability continues where the individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable.

25

(R. at 19.)  Even if this case were remanded with an order to fully elaborate on Ms. Eldrich's testimony, the evidence she presented is not inconsistent with the ALJ's decision.

Ms. Eldrich testified in 2004 that Plaintiff has had five to six seizures since 2002. This is consistent with Plaintiff's testimony that he experiences seizures once every three to six months.  Furthermore her account of Plaintiff's "brain freezes" and heavy breathing, even if accorded full credibility, are not enough to establish that Plaintiff is precluded from engaging in all substantial gainful activity.  Accordingly, in light of the evidence on record and despite a lack of detailed elaboration, there is no indication that the ALJ excluded Ms. Eldrich's testimony from consideration.

## III.  **CONCLUSION**

For the reasons stated above, the Commissioner's finding that Plaintiff is "not disabled" will be affirmed. The accompanying **Order** is entered.

**February 15, 2006**          **s/ Jerome B. Simandle**
DATE                           JEROME B. SIMANDLE
                               United States District Judge

26